FILED D & F
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 0 5 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

MARIE G. JOSMA,

               Plaintiff,

   -against-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION, and WOODHULL MEDICAL AND
MENTAL HEALTH CENTER,

               Defendants.

-------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

10-CV-3610 (ARR) (CLP)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

Marie Josma ("plaintiff" or "Josma") brings this action alleging employment

discrimination by the New York City Health and Hospital Corporation ("HHC") and the

Woodhull Medical and Mental Health Center ("Woodhull"). Plaintiff raises two causes of

action, including: (1) purposeful discrimination on the basis of her Haitian national origin, in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII");

and (2) implementation of a discriminatory policy, in violation of 42 U.S.C. § 1981. Josma

alleges that she was discriminated against in her employment as a respiratory therapist at

Woodhull based on her national origin and accent when she was terminated after failing to pass a

newly instituted, presentation-style competency test pertaining to a mechanical ventilator called

the Servo I. Defendants have moved for summary judgment pursuant to Federal Rule of Civil

Procedure 56. For the reasons stated below, the court grants defendants' motion.[1]

---

[1] Plaintiff's Memorandum of Law in Opposition to Defendants' Summary Judgment Motion addresses only
defendants' arguments relating to her Title VII and § 1981 claims. By failing to respond to defendants' arguments
against her hostile work environment claim, it appears that plaintiff has withdrawn or abandoned that claim, making
it ripe for dismissal. See Banushi v. City of New York, No. 08-CV-2937 (KAM) (JO), 2010 U.S. Dist. LEXIS

# I. BACKGROUND[2]

Josma identifies herself as a Black Haitian female with a strong Haitian accent. Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts (Defs.' Statement) ¶¶ 1-2; Plaintiff's Local Civil Rule 56.1 Statement Responding to the Local Rule 56.1(a) Statement of the Defendants (Pl.'s Statement) ¶¶ 1-2.

## A.    Josma's Employment with Brooklyn Hospital

Prior to her employment at Woodhull, Josma applied for a respiratory therapist position at Brooklyn Hospital. Sanchez Depo. at 11. She was interviewed by Estela Sanchez-Domenech, a Hispanic, Puerto Rican female, who served as a supervisor in the hospital's respiratory department. Defs.' Statement ¶ 14; Sanchez Depo. at 8, 11. Based on Sanchez-Domenech's recommendation, the director of the department decided to hire Josma for a part-time position. Id. at 11-12.

Josma's term began with a three-month probationary period, during which the hospital could assess whether she was a good fit for the respiratory department. Id. at 9. The hospital provided her with training on each of her duties, as well as on each piece of equipment with which she was expected to work. Id. at 14. Josma was then evaluated to determine whether she was competent to perform the various therapies required by her position. Id. at 12.

Although she demonstrated basic competency in the simpler tasks, Josma's grasp of the more complicated therapies—including those involving the Servo I ventilator—proved to be inadequate. Id. at 12-13, 16-17. According to Sanchez, Josma did not have a complete

---

109903, at *12-13 (E.D.N.Y. Oct. 15, 2010)

[2] For the purpose of this motion, the court shall consider undisputed those facts that the parties have admitted or that, when raised by one party, the other party has failed to properly address and are supported by the record. See Fed. R. Civ. P. 56(e). Where the parties have made evidentiary objections to particular statements of fact, the court has reviewed the record and relies only on those facts that would be admissible.

understanding of the ways in which more complicated pieces of equipment worked or how they interacted with patients. Id. at 16. Even after Josma received additional training on the equipment with which she lacked proficiency, id. at 13, her performance continued to fall below Sanchez-Domenech's and the department director's standards, id. at 9. As a result, Josma did not pass her probation at Brooklyn Hospital. Id. at 18.

## B.    Josma's Application for Employment at Woodhull Hospital

When Josma inquired whether there were any jobs at Woodhull, Sanchez-Domenech responded that there were. Id. at 18. According to Sanchez-Domenech, who also served as a supervisor at Woodhull, id. at 6, "[t]he level of work that's done at Brooklyn Hospital is quite different than the level of work done at Woodhull." Id. at 10. In particular, the respiratory department at Brooklyn Hospital had a number of different respiratory treatment protocols, many of which required a higher level of clinical skills and degree of independent thinking than that required at Woodhull. Id. at 10.

Josma initially applied for a position as an Associate Respiratory Therapist Level 1 (ARTL1) in Woodhull's Respiratory Care Department around April 2006. Pl.'s Statement ¶ 4. She was first interviewed by Erwin Evelyne, the Associate Director of the Respiratory Care Department, and then by Nnemdi Aroh-Bodden, the Assistant Director of the department. Id.; Evelyn Decl. ¶ 4. Both Evelyne and Aroh-Bodden are Black. Defs.' Statement ¶ 4. During the latter interview, Aroh-Bodden allegedly yelled at plaintiff and asked her why she had applied for the job. Pl.'s Statement ¶ 4. Aroh-Bodden said to Josma, "You can't even speak English. What are you coming for? " Id. She moreover accused Josma of "looking for money" and told her that she was not needed because the department was "looking for people who can communicate with doctor[s]." Id.

3

Josma's first application for an ARTL1 position was unsuccessful. Id. However, with Sanchez-Domenech's encouragement and assistance, Josma Decl. at 36-37, she reapplied for the position around November 2006, Pl.s' Statement ¶ 4. Josma was again interviewed again by Aroh-Bodden, who was "very nice" this time and apologized to her. Josma Decl. at 37. Subsequently, Evelyne recommended that Josma be hired for the position. Evelyne Decl. ¶ 5.

## C.  Josma's Employment with Woodhull Hospital

Josma was hired as a probationary ARTL1 ("ARTL1") in the Respiratory Care Department at Woodhull in January 2007. Defs.' Statement ¶ 3. She joined a team of twenty-six other ARTL1s, thirteen of whom were Haitian. Id. ¶ 25. The ARTL1s worked under the direction of six senior staff members, including Evelyne, Aroh-Bodden, and four supervisors: Sanchez-Domenech, Gilbert Jolin, Charthello Severe, and Antoine Noncent. Evelyne Decl. ¶ 7. All senior staff members, except Sanchez-Domenech, were Black, and all of the supervisors, except Sanchez-Domenech, were Haitian. Defs.' Statement ¶ 25.

The Respiratory Care Department provides respiratory services to patients who, as a result of cardiopulmonary problems, have difficulty breathing on their own. Id. ¶ 5. Rehabilitative ventilation services number among the critical services that the department provides. Id. These services involve the use of machines called ventilators, which provide a breathing mechanism for patients who are incapable of breathing adequately on their own. Id.

The ARTL1 position has a one-year probationary period. Id. ¶ 3. As a probationary ARTL1, Josma was required to, among other responsibilities: "[a]ssure[] and assist in the delivery and evaluation of all Respiratory Care Services," including during cardiopulmonary emergencies; "[a]ssure[] and perform[] cleaning, sterilization, setup, testing, trouble shooting[, and] maintenance of patient care equipment"; "[a]ssure[] and provide[] daily education to

patients about their therapeutic and preventative therapies; and "communicate[] any unusual and/or Hi[gh]-risk occurrences or situations to the department Coordinating Manager." Defs.' Ex. C. Josma underwent the Respiratory Care Department's orientation at the beginning of her probationary period, five weeks of which were devoted to training on the Servo I ventilator. Defs.' Statement ¶¶ 7-9.

### D. The ARTL1 Competency Assessments

#### 1. The initial competency assessments

From January until September 2007, Josma underwent various competency assessments, during which she was evaluated based on observations by supervisory staff, her performance on short quizzes, and her documentation of her work. Id. ¶ 11. Josma passed all of her competencies during this period. Id. ¶ 12-14; Pl.s' Statement ¶ 14; Pl.s' Exs. E-O. Among these were competencies relating to the Servo I ventilator, including a written examination at the end of her orientation, Josma Decl. at 57, and an in-service observation by Jolin on February 22, 2007, Ex. E. In addition, Aroh-Bodden rated Josma's competency on certain tasks relating to the ventilator on April 12, 2007 and determined that she "meets standards." Defs.' Ex. F. Around May 23, 2007, Josma received an overall "satisfactory" rating on her Criteria Based Performance Evaluation for the period of January 22 through April 22, 2007. Defs.' Statement ¶ 14. Sanchez-Domenech prepared the evaluation, and Aroh-Bodden reviewed it. Id.

#### 2. The new competency examination for the Servo I Ventilator

In mid-September 2007, however, the Respiratory Care Department modified the way in which staff would be evaluated for competency. Id. ¶ 15. Specifically, the department changed the focus of its assessment from a written-based examination to an interactive, presentation-style examination that simulated what could, and often did, happen when therapists treated patients.

Id.

In implementing the new competency examination, Evelyne and his senior staff members decided to "to assess staff on the Servo I ventilator first due to the fact that mechanical ventilation is the most crucial service provided in life and death situations for Woodhull patients." Evelyne Decl. ¶ 10. The Servo I ventilator has nine different modalities, which are settings that provide for different ventilation functions depending on a patient's specific needs. Defs.' Statement ¶ 19. All staff members were required to deliver presentations on each of the ventilator's modalities, during which they also had to set up the machine, go through the physical functions of the ventilator, and answer questions posed by supervisory staff. Id. ¶¶ 19, 21. In addition, each staff member was assigned an oral case study and was required to provide a diagnosis and treatment plan based on that case study. Id. ¶ 22.

The parties dispute why the department changed the format of its competency assessment. Evelyne declared that the changes were instituted in preparation for an upcoming 2008 Joint Commission Survey. Id. ¶ 15; Evelyne Decl. ¶ 6. The presentation-style examination, according to Evelyne, was developed to ensure patient safety, and to test staff members' knowledge, clinical thought process, clinical application, and clinical problem solving." Defs.' Statement ¶ 16; Evelyne Decl. ¶ 6. The new assessment emphasized interactive presentations "because communication skills are an important aspect of a respiratory therapist's position." Id. ¶ 14. For example, "[i]f a doctor asks a respiratory therapist a question, that respiratory therapist needs to be able to explain to that doctor what is happening with the patient." Id. This is particularly important because "[m]any times doctors do not have an in-depth understanding of ventilation, so the doctors depend on the respiratory therapists to manage the patient's respiratory condition." Id. Contesting the reasons set forth by Evelyne, Josma

6

asserts that the purpose of the new examination was to "eliminate Haitian employees with strong accents." Pl.s' Statement ¶ 15.

The parties also dispute the way in which the new examination was administered. Evelyne declared that he and his senior staff decided that the new test should be given at a moment's notice. Defs.' Statement ¶ 17; Evelyne Decl. ¶ 8. In contrast, Josma claims that staff members were usually given eight days of advance warning to prepare for an examination. Josma Depo. at 98. She further alleges that she was surprised about her examination date on three separate occasions, when she was initially notified that she would be tested on a particular date but was then ultimately tested on a different date. Id. at 97.

In addition, defendants have produced evidence that the hospital provided staff members with materials to help them prepare for their Servo I competency examinations. Defs.' Statement ¶ 23. These materials included, among other items, a manual explaining the ventilator's nine different modalities. Id. Josma alleges that she did not receive preparatory materials prior to her first two examinations, but fails to adduce any evidence contradicting defendants' specific evidence to the contrary. Pl.s' Statement ¶ 23; Pl.s' Ex. V; Evelyne Decl. ¶¶ 18, 20.

All twenty-seven of the ARTL1s in the Respiratory Care Department were required to pass the presentation competency exam for each modality of the Servo I ventilator. Defs.' Statement ¶ 24. And all of the ARTL1s—except for Josma—eventually presented each modality in a satisfactory manner. Id. ¶ 27. Moreover, each of the thirteen Haitian ARTL1s who successfully passed the competency examination for each modality of the ventilator—again excluding plaintiff—are still employed by Woodhull. Id.

### 3. Josma's repeated failures to pass the new Servo I competency examination

Josma's first attempt to pass the new competency examination for the ventilator took

place around November 6, 2007, when she was asked to present the Pressure Control (PC) modality of the machine. Id. ¶ 28. Sanchez-Domenech and Noncent evaluated her presentation based on five categories: (1) "[d]isplays knowledge of essential concepts"; (2) "[d]emonstrates the relationship between theory and critical practice"; (3) "[e]xhibits the required manual dexterity"; (4) "[e]xhibits courteous and pleasant demeanor"; and (5) "[a]udibility and clarity of oral presentation." Defs.' Ex. I. Noncent gave Josma a "below average" rating in the first three categories and commented that plaintiff needed to review and further understand the concepts of using the PC modality. Id. Sanchez-Domenech, in turn, gave plaintiff "below average" ratings in the first two categories. Id. In addition, she observed that Josma committed "critical error" in terms of PC levels and adjustments. Id. Sanchez-Domenech also commented that Josma needed to study with more diligence and develop the ability to verbalize the basic concepts of PC and its relationship to clinical practice. Id.

As a result of her poor performance, Josma was afforded an additional opportunity to present the Servo I ventilator in the PC modality. Defs.' Statement ¶ 32. Evelyne instructed his supervisory staff to provide Josma with additional material to help her prepare for her second interactive competency presentation. Id. ¶ 33. In addition, Evelyne instructed the Respiratory Care Department's senior staff not to assign Josma to ventilated patients until she passed her Servo I interactive competency presentation. Id. Although Plaintiff's Statement denies the imposition of such a restriction, Pl.'s Statement ¶ 37, Josma concedes that supervisory staff did, in fact, tell her that she could no longer perform work involving the ventilator, Josma Depo. 139. That Josma continued to work with patients in the Emergency Room, Pl.'s Statement ¶ 37, is not inconsistent with a restriction that she not be assigned to ventilated patients.

A week later, around November 17, 2007, Josma presented the PC modality of the Servo

I ventilator for the second time. Defs.' Statement ¶ 34. Noncent and Sanchez-Domenech rated Josma's performance once more. Id. Noncent gave plaintiff "below average" ratings in the same three categories as before and commented that "Josma was not able to display or demonstrate the essential basic knowledge of using [the] PC mode." Defs.' Ex. I. Sanchez-Domenech rated Josma as "below average" in the same three categories. She also noted that Josma "clearly does not grasp the essential concepts and the relationship between theory [and] clinical practice." Id.

In response to Josma's second unsatisfactory presentation, Evelyne instructed the department's senior staff to continue restricting Josma's duties to ensure patient safety. Evelyne Decl. ¶ 21. He also instructed senior staff to continue helping Josma master the Servo I ventilator and its modalities. Id. Josma claims that these remedial measures did not begin until after her third unsuccessful presentation. Pl.s' Statement ¶ 37. However she cites only a passage in her deposition stating that Evelyne took remedial measures after her third attempt; that passage does not address whether Evelyne also took remedial measures after Josma's second failed attempt. Josma Decl. at 111. In addition, Evelyne decided to have another staff member shadow Josma in the event that she was confronted with ventilated patients. Defs.' Statement ¶ 38. While defendants assert that the shadowing applied "whenever" plaintiff was confronted with such patients, id., Josma avers that it lasted only a single day. Josma Depo. at 140.

Around January 28, 2008, Evelyne became aware that plaintiff was having difficulty preparing for the Servo I competency examination. Defs.' Statement ¶ 39. As a result, he sought advice from the hospital's Office of Labor Relations. Evelyne Decl. ¶ 24. Evelyne spoke with Michelle Emmons, who advised him that Josma's probationary period could be extended so that she could have additional time to pass her competency examination. Id. Josma's probationary

period was scheduled to end on January 22, 2008. Id. ¶ 25. Around that time, Sanchez-Domenech passed Josma on her one-year evaluation, with the qualification that Josma "need[ed] to do some work in terms of increasing her knowledge base on ventilator support." Sanchez-Domenech Depo. at 65. Josma and Sanchez-Domenech understood this to mean that Josma had passed her one-year probationary period. Pls. Statement ¶ 40. On the last day of her probationary period, however, Josma entered into an agreement with Labor Relations extending her probationary period for an additional six months. Defs. Statement ¶ 40; Defs.' Ex. J.

During Josma's extended probationary period, the department continued the remediation process to prepare her for the Servo I ventilator competency examination. Id. ¶ 41. The restriction that she not work with ventilated patients also remained in place. Id. Around late Janaury 2008, Evelyne asked Sanchez-Domenech to provide Josma with additional reading material to enhance her knowledge of the Servo I ventilator and to assist her with passing the examination. Id. ¶ 42. And around January 29, 2008, a supervisor was assigned to assist Josma in understanding and verbalizing the concepts, theory, and practice of caring for ventilated patients. Id. ¶ 43.

Around February 2008, Josma received an overall "Satisfactory" rating on her Criteria Based Performance Evaluation for the period of April 23, 2007 through January 22, 2008. Id. ¶ 44. Sanchez-Domenech prepared this evaluation, which was reviewed by Aroh-Bodden. Id. However, Sanchez-Domenech qualified her rating with the note that Josma needed improvement in demonstrating her proficiency with the Servo I ventilator. Id. Based on this evaluation, Josma was given an improvement plan for increasing her knowledge base in mechanical ventilation. Id. ¶ 45. Sanchez-Domenech noted that Josma would be provided with additional study material as well as remediation exercises. Id. In addition, Sanchez-Domenech documented that Josma

would continue doing oral presentations on the ventilator, and that the department expected to see improvement within two months. Id.

Around February 20, 2008, Josma delivered her third presentation on the Servo I ventilator, this time focusing on the machine's Pressure Regulated Ventilation Control (PRVC) modality. Id. ¶ 46. Sanchez-Domenech and Aroh-Bodden observed and rated Josma's presentation. Id. Both senior staff members rated plaintiff as "below average" in the category of "[a]udibility and clarity of oral presentation." Defs.' Ex. L. In addition, they rated her as demonstrating "poor and unacceptable performance" in the categories of (1) "[d]isplays knowledge of essential concepts"; and (2) "[d]emonstrates the relationship between theory and critical practice." Id. Sanchez-Domenech and Aroh-Bodden added that Josma was neither able to demonstrate basic knowledge of the mechanical ventilator nor describe the breath types that corresponded to the mode Josma was describing. Id. They further noted that Josma was unable to talk or write about the relationships between theory and critical practice, and that she was still lacking in the fundamental principles of mechanical ventilation. Id.

Due to Josma's third unsatisfactory examination, Evelyne assigned a supervisor to work with her in understanding and verbalizing the theory, concepts, and practice of caring for patients utilizing the ventilator. Defs.' Statement ¶ 48. Josma recalled that Noncent worked hard with her to master the ventilator and taught her very well. Josma Depo. at 111.

Around March 19, 2008, Plaintiff took her fourth competency examination for the Servo I ventilator, again presenting the machine's PRVC modality. Id. ¶ 50. Once more, Sanchez-Domenech and Aroh-Bodden observed and rated Josma's presentation. Id. Both senior staff members rated plaintiff as "below average" in the categories of: (1) "[a]udibility and clarity of oral presentation"; and (2) "[e]xhibits the required manual dexterity." Defs.' Ex. M. In addition,

11

they again rated her as demonstrating "poor and unacceptable performance" in the categories of (1) "[d]isplays knowledge of essential concepts"; and (2) "[d]emonstrates the relationship between theory and critical practice." Id. The raters added that Josma had not displayed the essential knowledge for using PRVC and that a basic understanding of how to use the mechanism was "extremely important." Id. They further documented that Josma was unable to grasp the relationships between theory and clinical practice, and that she "displayed a gross inability to discuss essential concepts needed for care for [a] mechanically ventilated patient in a[n] acute care [h]ospital setting." Id.

Josma alleges that after her third or fourth presentation, she overhead Domenech-Sanchez making a comment that Josma barely spoke English yet made "the same kind of money" as her co-workers who spoke English well. Josma Depo. at 80.

Around March 20, 2008, the Respiratory Care Department held a senior staff meeting. Defs.' Statement ¶ 52. During this meeting, Evelyn requested an update from Noncent regarding Josma's progress on the Servo I ventilator. Id. Based on Noncent's description of plaintiff's performance, Evelyne understood that Josma had not improved. Id. Thereafter, on April 3, 2008, Noncent assessed Josma's overall performance for the period of January 22, 2008 through March 22, 2008 in a Criteria-Based Performance Evaluation. Id. ¶ 53. Noncent gave plaintiff a rating of "Needs Improvement" in ten categories of job-related responsibilities, all stemming from her lack of knowledge relating to the Servo I ventilator and her inability to pass the presentation-style competency examination. Id. ¶54.

**E.      Josma's Termination**

Based on Josma's repeated failure to pass the examination, Evelyne submitted a request for disciplinary action to the Office of Labor Relations. Id. ¶ 55. Around May 8, 2008, Josma

was notified that Charges and Specifications had been preferred against her. Id. ¶ 56; Defs.' Ex. P. Josma was also informed that, pursuant to her collective bargaining agreement, a disciplinary conference would be held on June 2, 2008 regarding the Charges and Specifications. Defs.' Statement ¶ 57.

The June 2, 2008 disciplinary conference was held before a Conference Officer, an employee of the defendants' Office of Human Resources. Defs.' Ex. Q. Josma, her union representative, the union president, and Evelyne all attended the conference. Defs.' Statement ¶ 58. Josma's union representative alleged that Josma had not been afforded the same courtesies as other staff, such as being given advance notice of her examination dates. Defs.' Ex. Q. In response, Evelyne decided to provide Josma with one additional opportunity to take the test. Defs.' Statement ¶ 59. Josma's union representative requested that the examination be given on June 5, 2008, and Evelyne scheduled the examination accordingly. Id.

Josma took her fifth and final competency examination as scheduled. Id. ¶ 60. Noncent and Severe evaluated her presentation. Id. The two supervisors rated her performance as "below average" in the categories of (1) "[d]isplays knowledge of essential concepts"; and (2) "[d]emonstrates the relationship between theory and critical practice." Defs.' Ex. R. In addition, they found that she had demonstrated "poor and unacceptable performance" in the area of "[a]udibility and clarity of oral presentation." Id. They moreover added that Josma needed to improve her basic knowledge and skills in mechanical ventilation. Id.

Evelyne also sat in on Josma's final presentation. Defs.' Statement ¶ 62. He "immediately noticed that plaintiff consistently paused for several minutes during her presentation, and often forgot where she was in her presentation after long pauses." Evelyne Decl. ¶ 37. Because Josma was having difficulty presenting the topic, Evelyne decided to ask

her some basic questions relating to the ventilator. Id. However, Josma did not respond to any of Evelyne's questions directly and instead provided "scenario-type responses which were either incorrect or did not address the question[s] that [Evelyne] had asked." Id. The presentation should have lasted no longer than thirty minutes, but "lasted approximately two hours due to the plaintiff's long pauses." Id. Evelyne declared that his observations were consistent with what senior staff had reported to him and that he was "very concerned." Id. ¶ 38. He communicated his observations to the Conference Officer, stressing his concerns about patient safety given "plaintiff's inability to demonstrate even the most basic knowledge of the Servo I ventilator." Id.

In a June 5, 2008 written decision, the Conference Officer found that respiratory therapists are "at the front line of patient care" and thus occupy a role for which there can be "no margin of error." Defs.' Ex. Q. Explaining that competency assessments are an important means of gauging a therapist's proficiency in the use of the ventilator, the officer determined that repeated failures indicate a lack of competency, "which in a clinical setting can have a drastic impact on patient care." Id. The Conference Officer further concluded that "the North Brooklyn Health Network has an obligation to minimize to the greatest extent possible risks to patients and must therefore separate from service individuals who fail to meet competency assessments." Id. Accordingly, the officer determined that Josma should be separated from her position of ARTL1. Id. Josma was informed in a June 11, 2008 letter that her employment would be terminated effective June 12, 2008. Defs.' Statement ¶ 66.

The Respiratory Care Department continued to administer the new competency examination for some time after Josma's termination. Sanchez-Domenech Depo. at 39-40. Starting in 2009, only new hires were required to take examination. Id. The department had its last new hires in 2009, and has not administered the examination since then. Id.

**F.    Josma's Subsequent Employment**

Josma worked as a respiratory therapist at Peninsula Hospital both during and after her

employment with Woodhull. Josma Depo. 20-21. In addition, she was hired by the Holly

Paterson Nursing Home as a respiratory therapist after her termination by Woodhull. Id. at 21-

22. As of the date of her deposition, Josma had been employed at Peninsula for over four years

and at Holly Paterson for over two years. Id. at 20-21.

## II. DISCUSSION

**A.    Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine

whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby. Inc., 477 U.S. 242,

249 (1986). "While genuineness runs to whether disputed factual issues can 'reasonably be

resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it

concerns facts that can affect the outcome under the applicable substantive law." Graham v.

Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal citations omitted) (quoting Anderson, 477

U.S. at 250).

In assessing whether summary judgment is appropriate, the court considers "the

pleadings, depositions, answers to interrogatories and admissions on file, together with any other

firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156

(2d Cir. 2011) (quoting In re Bennett Funding Group., Inc., 336 F.3d 94, 99 (2d Cir. 2003)

(internal quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party carries the burden of proving that there is no genuine dispute respecting any

material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

## B.     Which Defendant Is Subject to Suit

Defendants argue, and plaintiff does not contest, that Woodhull lacks the capacity to be sued. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter § 396. By statute, the HHC has the capacity to be sued. See N.Y. Unconsol. Law § 7385(1). However, no exception exists for individual facilities owned and operated by HCC, and Woodhull is therefore not subject to suit. See Nogbou v. Mayrose, 07 Civ. 3763, 2009 U.S. Dist. LEXIS 96118, *19 (S.D.N.Y. Oct. 14, 2009); Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 287-88 (S.D.N.Y. 2006); Ayala v. Bellevue Hosp., 1999 U.S. Dist. LEXIS 12982, No. 94 Civ. 1551 (WHP), *8-9 (S.D.N.Y. Aug. 19, 1999).

Accordingly, the court grants summary judgment for defendant Woodhull as to all of Josma's claims.

## C. Josma's Title VII Claim

### 1. Legal framework

Title VII makes it unlawful for an employer "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Analysis of Title VII claims are evaluated under the three-part burden shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973). <u>See, e.g.,</u> <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005). Under this framework, plaintiff bears the initial burden of making out a prima facie case of discrimination by showing, by a preponderance of the evidence, that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>See, e.g.,</u> <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002). Although plaintiff's burden of proof at this stage has been characterized as "'minimal' and '<u>de</u> minimus,'" <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005) (quoting <u>Zimmerman v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001)), "it is not non-existent," <u>Almond v. Westchester County Dep't of Corr.</u>, 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006).

If plaintiff carries her initial burden, the burden shifts to the defendant to identify "'some legitimate, nondiscriminatory reason'" for its action. <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 106 (2d Cir. 2010) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). If defendant meets this burden, "the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual." <u>Hill v. Rayboy-Brauestein</u>, 467 F. Supp. 2d 336, 350

(S.D.N.Y. 2006) (citing Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004)). Speculation and conclusory allegations of discrimination are not sufficient to meet this burden at the summary judgment stage. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."); Little v. New York, No. 96-CV-5132 (SJ), 1998 Dist. LEXIS 21797 (E.D.N.Y. June 8, 1998) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."), aff'd No. 98-7979, 1999 U.S. App. LEXIS 7768 (2d Cir. Apr. 14, 1999). Instead, plaintiff must come forward with "'concrete particulars,'" R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)), that "would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).

**2.      Josma has not established a prima facie case**

The parties do not dispute that Josma has established the first and third elements of her prima facie case: that she is a member of a protected class due to her Haitian national origin and that she suffered an adverse employment action when Woodhull terminated her employment. The parties, however, do dispute whether Josma has proven the second and fourth elements: that she was qualified for the ARTL1 position and that her termination occurred under circumstances giving rise to an inference of discrimination. Based on its review of the undisputed evidence in the record, the court holds that plaintiff has not established that she was qualified for her position, and, even if she was, her termination from that position did not occur under

18

circumstances giving rise to an inference of discrimination.

### a.    Qualification for position

Josma contends that she was qualified for the ARTL1 position in the Respiratory Care Department at Woodhull. To satisfy the qualification prong of a prima facie case, a plaintiff "must show only that he 'possesses the basic skills necessary for performance of the job.'" Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) (quoting Owens v. N.Y.C. Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991). This burden is "minimal." Id. Nonetheless, the plaintiff's qualifications must be assessed by "the criteria the employer has specified for the position." Thorton v. Penton Publ'g, Inc., 104 F.3d 26, 30 (2d Cir. 1997) (emphasis added). In other words, "the ultimate inquiry is whether an employee's performance meets his employer's legitimate expectations." Meiri, 759 F.2d at 995 (internal quotation marks and citation omitted). Courts must allow employees to demonstrate that an employer's demands were "illegitimate or arbitrary," but must otherwise "refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process." Id. (internal quotation marks and citation omitted).

Josma does not dispute that she failed to meet defendants' expectations regarding job performance for the ARTL1 position. The parties agree that the Respiratory Care Department required all of its therapists to satisfactorily pass the new, presentation-style competency examination for each modality of the Servo I ventilator beginning September 2007. They moreover agree that Josma failed to pass this examination five times over the course of eight months—notwithstanding the department's efforts to help Josma prepare for the exam by providing her with additional study materials, setting forth an improvement plan, and assigning a supervisor to work with her on understanding and verbalizing the concepts, theory, and practice

of caring for ventilated patients.

Despite being afforded multiple opportunities to take the examination, Josma repeatedly received ratings of "below average" or "poor and unacceptable performance" on two to four out of the five assessment categories; the single category in which Josma consistently received satisfactory ratings was "[e]xhibits courteous and pleasant demeanor." Not surprisingly, defendants expected their respiratory therapists to possess qualifications beyond mere civility. The senior staff who evaluated Josma repeatedly observed that she did not have an adequate grasp of even the basic skills and knowledge pertaining to mechanical ventilation. That Josma and Sanchez-Domenech understood Josma to have passed her initial, one-year probationary period is insufficient to create an inference that Josma was qualified for the ARTL1 position, given that her initial probationary period was extended for another six months the very day that it was scheduled to end.[3]

Plaintiff instead challenges the legitimacy of defendants' job performance criteria, arguing that the new, presentation-style competency examination was "a subterfuge for failing and ultimately terminating Ms. Josma based upon her Haitian accent and manner of speech and not based upon her command (or lack thereof) of the ventilator's use and/or purpose." Pl.s' Memo at 2. In essence, she alleges that defendants' expectations were "illegitimate or arbitrary," Meiri, 759 F.2d at 995 (2d Cir. 1985) (internal quotation marks and citation omitted), or were not "honestly-held," Thornley, 104 F.3d at 30, such that a rational fact-finder could determine

---

[3] "[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." Slattery, 248 F.3d at 92. However, "an inference of minimal qualification is less readily available in cases such as this where the employee is hired on a probationary basis. As civil service regulations reflect, the very purpose of a probationary period is 'to determine the fitness of the employee' and allow him to "demonstrate fully his qualifications for continued employment." O'Neal v. Nicholson, No. 04 Civ. 7724(DLC), 2006 WL 839075, at *3 n.2 (S.D.N.Y. Mar. 31, 2006). The Second Circuit likewise recognizes that although the showing required to make a prima facie case should be minimal, an employee who fails to prove his qualifications during a probationary period may not be able to carry this burden. See Gregory v. Daly, 243 F.3d 687, 697 n.7 (2d Cir. 2001).

that she was qualified for the ARTL1 position despite her inability to meet defendants' standards. Josma advances three specific arguments to this effect.

First, Josma maintains that she was qualified for the ARTL1 position because she passed all of her competency assessments before the department instituted its new, interactive presentation-style examination in September 2007. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."), at 7. That Josma passed the old competency evaluations, however, does not undermine the legitimacy of the more rigorous examination that defendants instituted in September 2007. Defendants have submitted evidence that they implemented the new examination in preparation for the 2008 Joint Commission Survey. They have also adduced evidence that the new examination tested skills relevant to an ARTL1's job responsibilities. For example, an ARTL1 is charged with communicating with doctors and educating patients about their therapies, duties that may very well require the therapist, when working with ventilated patients, to understand and explain the functionalities of the Servo I ventilator.

Plaintiff makes much of the fact that Woodhull has not administered the new examination since 2009—that is, since after her employment was terminated. But the record provides a ready explanation for this timing: the department required each therapist to pass the examination once. Because Woodhull's newest therapists were hired and took the examination in 2009, defendants have not administered the examination since that point. Furthermore, Josma was separated from her employment in June 2008, which means that the defendants continued to administer the new examination for approximately one-and-a-half years after plaintiff was terminated. The substantial intervening time between Josma's termination and the non-use of the examination undermines, rather than supports, an inference of bad faith. Cf., Arroyo v. N.Y. Downtown

21

Hosp., No. 07 CV 4275(RJD)(LB), 2010 WL 3861071, at *7 (E.D.N.Y. Sept. 28, 2010) (speculating that temporal proximity may have been sufficient to create an inference of discrimination where an employee sent an email criticizing management on September 22, 2006, received a negative performance review on October 16, 2006, and was terminated on November 30, 2006); Forde v. Beth Israel Med. Ctr. 546 F. Supp. 2d 142, 143, 152 (S.D.N.Y 2008) (noting that timing might have supported an inference of discrimination where an employee was fired one week after announcing her pregnancy); Timbol v. Commercial Bank of Kuwait, No. 99 Civ. 1891(DAB), 2000 WL 282886, at * 7 (S.D.N.Y. Mar. 15, 2000) (concluding that the timing of plaintiff's termination, which occurred two weeks after he provided his mental health diagnosis to his employer, was sufficient to raise an inference of discrimination).

Second, Josma contends that her qualification for the ARTL1 position is substantiated by a statement that a former co-worker at Woodhull, Daniel Bellevue, submitted to the Division of Human Rights. Pl.'s Mem. at 7. Specifically, Bellevue opined that Josma "was competent to do the work" but that "her issue is that she had a problem [with] the public speaking." Pl.s' Ex. P. However, a coworker's positive opinion of a plaintiff's work is inadequate to create an issue of fact where the employer was dissatisfied with plaintiff's performance. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir. 1994); Shabat v. Blue Cross Blue Shield of the Rochester Area, 925 F. Supp. 977, 987 (W.D.N.Y. 1996). Josma's reliance on Bellevue's assessment thus cannot create a factual dispute regarding her qualification for the ARTL1 position.

Finally, Josma contends that her extended employment as a respiratory therapist at two other institutions demonstrates that she was also qualified for the ARTL1 position at Woodhull. Pl.'s Mem. at 7. Specifically, she highlights that she has maintained her position at Peninsula

22

Hospital Center for over four years, and has moreover worked at the Holly Patterson Nursing Home for more than two years. Josma Depo. at 20-21. However, plaintiff's competent performance in respiratory therapist positions elsewhere does not help to establish her qualification for the ARTL1 position at Woodhull. The Second Circuit has held that "a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance." Thorton, 104 F.3d at 30 (emphasis added). This requirement reflects Second Circuit precedent that an employee may be discharged "on the basis of subjective business judgments, for any reason that is not discriminatory." Stanojev v. Ebasco Servs., Inc., 643 F.2d 914, 921 (2d Cir. 1981). It moreover comports with an understanding that jobs with similar or even identical titles may entail different responsibilities, as demonstrated by the record here. As Sanchez-Domenech observed, for example, the respiratory therapist position at Brooklyn Hospital was significantly more demanding than the ARTL1 position at Woodhull, requiring mastery over a wider range of more complicated therapies, as well as a greater degree of independent judgment. Accordingly, plaintiff's sustained employment as a respiratory therapist at two other facilities fails to generate a material factual dispute regarding her qualification for the ARTL1 position at Woodhull.

### b. Inference of discrimination

Plaintiff argues that defendants terminated her employment because of her strong Haitian accent. Pl.s' Memo at 8. To meet the fourth prong of the McDonnell Douglas prima facie test, Josma must show that her termination took place under circumstances supporting an inference that defendants discriminated against her because of her national origin; "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable.'" Hill, 467 F. Supp. 2d at 356 (internal quotations marks and citation

23

omitted). In an effort to meet this burden, Josma points to evidence that: (1) Sanchez-Domenech and Aroh-Broden made derogatory remarks about her ability to speak English; (2) defendants altered the competency assessment for the Servo I ventilator to focus on oral communication skills and gave her poor ratings on criteria associated with such skills; and (3) defendants stopped administering the new examination following her termination. Pl.s' Memo. at 8-11. None of these circumstances, either separately or together, is sufficient to support an inference of discrimination.

To begin, a plaintiff may demonstrate indicia of discrimination by providing evidence of degrading or invidious comments made by his employer relating to the plaintiff's protected class. See Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009). However, without more, isolated and disconnected derogatory remarks are generally insufficient to raise such an inference, even when made by a decision-maker. See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998). An employee must instead adduce evidence of a nexus between the allegedly discriminatory statements and an employer's decision to terminate the employee. See Beachum v. AWISCO N.Y. and Local 810, Int'l Bhd. of Teamsters,785 F. Supp. 2d 84, 95-96 (S.D.N.Y. 2011). In determining whether such a nexus exists, a court should "assess the remarks' 'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" Galimore v. City Univ. of N.Y. Bronx Cmty. Coll., 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009) (quoting Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007)).

Josma points to two instances in the record in which supervisory staff allegedly made discriminatory remarks toward her. First, during Josma's initial interview for the ARTL1 position, Aroh-Bodden allegedly said, "You can't even speak English. What are you coming

for? " Pl.s' Statement ¶ 4. According to Josma, Aroh-Bodden also accused her of "looking for money" and told her that she was not needed because the department was "looking for people who can communicate with doctor[s]." Id. Second, Josma asserts that she overheard Domenech-Sanchez commenting that Josma barely spoke English yet made "the same kind of money" as her co-workers who spoke English well. Josma Depo. at 80. These comments, Josma asserts, demonstrate that defendants discriminated against her based on her accent and therefore national origin. Pl.'s Memo at 8.

While an individual's manner of speaking may be inextricably intertwined with his national origin, see, e.g., Berke v. Ohio Dep't of Pub. Welfare, 628 F.2d 980, 981 (6th Cir. 1980); Carino v. Univ. of Okla. Bd. Of Regents, 750 F.2d 815, 819 (10th Cir. 1984), this is not always the case. For example, some individuals of Haitian national origin have Haitian accents, whereas others who do not; likewise, some individuals of Haitian national origin speak English fluently, whereas others do not. Josma cannot circumvent the limitations on protected classes under Title VII, see 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination only on the basis of "race, color, religion, sex, or national origin"), simply by equating her manner of speaking with her national origin or by imputing such an equation to her superiors.

This case bears a close resemblance to Watt v. N.Y. Botanical Garden, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000), in which the plaintiff, who was of Jamaican national origin, tried to prove that her employer's comments that she did not speak clearly were motivated by bias against persons of Jamaican national origin. In rejecting the plaintiff's argument, the Watt court explained:

> From these remarks, the plaintiff asks the Court to infer that [plaintiff's employer] was biased against her because of plaintiff's Jamaican origin. To make the inferential leap that plaintiff would like requires not one inference, but a stacking of two inferences: that "I can't understand the way you speak" is a comment

about the plaintiff's accent, and that, in turn, a comment about the plaintiff's accent suggests underlying bias against persons of Jamaican origin. Were there no other facts in this record, it might be a close question whether these two remarks would be sufficient to defeat summary judgment.

Id.

Here, as in Watt, however, "there are facts in the record that completely undermine the rationality of this double inference." Id. Any inference of discrimination based on Josma's national origin is severely undermined by the undisputed fact that defendants employed thirteen other Haitian ARTL1s during Josma's term of employment (i.e., half of the ARTL1s were of Haitian descent), and continued to do so afterward; there is, moreover, no evidence that senior staff members made derogatory comments toward, or took adverse employment actions against, any of the thirteen other Haitian ARTL1s. See id. at *8 (explaining that any inference of discrimination was undermined by undisputed evidence that prior to and immediately following the plaintiff's employment, her employer supervised seven or eight employees, two of whom were, like plaintiff, of Jamaican origin).

In addition, both Aroh-Bodden and Sanchez-Domenech contributed to Josma's placement at Woodhull in the first place. Specifically, Sanchez-Domenech encouraged and assisted Josma in applying for the ARTL1 position, and Aroh-Bodden served as one of Josma's interviewers. To the extent that the two senior staff members subsequently contributed to Josma's termination, it would be reasonable to apply the "same actor inference" here. See Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997). In other words, where a person who undertook a favorable employment action benefitting the plaintiff was the same person who later undertook an adverse employment action against the plaintiff, it is difficult to impute to that individual an invidious motivation that would be inconsistent with the initial, favorable action. See id.; see also Ruane v. Continental Casualty Corp., No. 96 Civ. 7153(LBS), 1998 WL 292103, at *8

26

(S.D.N.Y. June 3, 1998) ("[T]he underlying rationale for the inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class."). That Sanchez-Domenech helped Josma secure the ARTL1 position, and that Aroh-Bodden contributed to the hiring decision, thus cast doubt on a claim that these two individuals subsequently developed an animus against Haitians that contributed to Josma's termination.

Furthermore, five of the six senior staff members—not just Aroh-Bodden and Sanchez-Domenech—evaluated plaintiff's performance on the new competency examination, and each gave her similarly negative reviews. See Hawana v. City of New York., 230 F. Supp. 2d 518, 527 (S.D.N.Y. 2002) ("[G]iven the number of supervisors [i.e., four], such a single stray remark would not be sufficient to raise an inference of discrimination."). Two of these senior staff members were, moreover, Haitian and therefore of the same protected class as Josma; that they likewise rated Josma poorly undermines an inference that it was a bias against Haitians that led to Josma's termination. See, e.g., Rinsler v. Sony Pictures Entm't, No. 02 Civ. 4096 (SAS), 2003 U.S. Dist. LEXIS 14754, *26-27 (S.D.N.Y. Aug. 22, 2003). In addition, there is no evidence that Evelyne, whose assessment of Josma's performance on her final competency examination appears to have been the dispositive factor in her termination, made any comments demonstrating a bias against individuals of Haitian national origin.

Accordingly, Aroh-Bodden's and Sanchez-Domenech's alleged, isolated comments to plaintiff, while undoubtedly inappropriate, are not sufficient to give rise to an inference of discrimination against individuals of Haitian national origin.

Josma further alleges that discriminatory intent can be inferred from defendants' modification of the competency assessment for the Servo I ventilator to focus on oral

communication skills. But despite Josma's attempt to frame the new examination as an assessment solely of oral communication skills, "[a]udibility and clarity of oral presentation" constituted only one of the five criteria on which a therapist's presentation was judged. Three of the four other criteria—the ones in which Josma consistently failed to demonstrate adequate proficiency—included: (1) "[d]isplays knowledge of essential concepts"; (2) "[d]emonstrates the relationship between theory and critical practice"; and (3) "[e]xhibits the required manual dexterity." Josma's reviewers' undisputed comments moreover indicate that their core concern was her inability to grasp the basic concepts of mechanical ventilation.

Furthermore, to the extent that the new examination did emphasize proficiency in oral communication skills, this alone does not give rise to an inference of discrimination. "'There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance.'" Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 399 (S.D.N.Y. 1999) (quoting Fragante v. City and County of Honolulu, 888 F.2d 591, 596-97 (9th Cir. 1989)). Indeed, Josma concedes that the new examination simulated what could, and often did, happen when therapists were treating patients. The undisputed facts moreover indicate that oral communications skills are critical to the ARTL1 position; a therapist must be able to communicate about mechanical ventilation with both patients and doctors, including in life-or-death emergency situations. In sum, Josma has adduced no evidence supporting her bare allegation that defendants' adoption of the new, presentation-style Servo I competency examination was motivated by discriminatory animus.

Finally, Josma asserts that defendants' discriminatory motive in implementing the new examination can be inferred from their allegedly ceasing to administer the new examination

28

"shortly, if not immediately, after Ms. Josma's termination." Pl.'s Memo at 3. This characterization misrepresents the record, which shows that the Respiratory Care Department continued to administer the new examination through 2009—that is, up to one-and-a-half years after Josma was terminated in June 2008. Moreover, the record reflects that the reason why defendants have not administered the new examination since 2009 is because every therapist employed by the department had already taken the examination by the end of 2009. The department has not hired any new therapists since that time.

Based on the foregoing, Josma has failed to raise a genuine issue of material fact as to either her qualification for the ARTL1 position or an inference of discrimination relating to her termination. She therefore has not satisfied the requirements for establishing a prima facie case under Title VII.

### 3. Josma has not shown that defendants' proffered reasons are pretextual

Even if Josma has established a prima facie case of discrimination, defendant's motion must be granted because Josma is unable to satisfy her burden of showing that defendants' proffered reasons for their actions were false and that discrimination was defendants' true motivation. In response to plaintiff's allegations of discrimination, defendants state that Josma was terminated because she "could not demonstrate an understanding of the Servo I ventilator during the presentation competency exams." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, at 15.

Josma admits that the interactive, presentation-style examination for the Servo I ventilator simulated what could, and often does, happen when respiratory therapists treat patients. She has moreover failed to produce any evidence contradicting defendants' evidence that the examination constituted an important means for the Respiratory Care Department to

asses a therapist's competency in using the ventilator, and that an ARTL1's incompetence in this area could compromise patient safety. In addition, the undisputed facts indicate that Josma failed the examination five times during her probationary period—notwithstanding the department's efforts to help her pass by providing her with additional study materials, delineating an improvement plan, and assigning a supervisor to assist her with understanding and verbalizing the concepts, theory, and practice of caring for ventilated patients. Despite being given multiple opportunities to take the examination, Josma repeatedly received ratings of "below average" or "poor and unacceptable performance" on two to four out of the five assessment categories. In contrast, all twenty-six of the other ARTL1s—including the thirteen who were of Haitian national origin—successfully passed the examination.

The court therefore finds defendant's explanation for terminating Josma to be a "legitimate, nondiscriminatory reason," McDonnell Douglas, 411 U.S. at 802. Josma has not adduced evidence capable of showing that these reasons are pretextual or otherwise unworthy of credence. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

**D.      Josma's § 1981 Claim**

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Significantly, this provision protects against discrimination based on a plaintiff's race, rather than discrimination based "solely on the place or nation of his origin." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (U.S. 1987). Because Josma does "not allege that the Defendants discriminated against her on the basis of her race," Pl.'s Statement ¶ 1, her § 1981 claim fails as a matter of law.

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

s/Allyne R. Ross

_____
Allyne R. Ross
United States District Judge

Dated:      September 4, 2012
               Brooklyn, New York